Gentry POLITTE, d/b/a Politte Funeral Home (Plaintiff), Appellant,

v.

Arlie Peter MILLER (Defendant), Respondent.

No. 29544.

St. Louis Court of Appeals.

Missouri.

May 7, 1957.

**840**

Dearing, Richeson & Weir, Samuel Richeson, Hillsboro, for appellant.

Hullverson, Richardson, Hullverson & Jeans, James W. Jeans, St. Louis, Louis L. Hicks, Clayton, for respondent.

HOUSER, Commissioner.

Gentry Politte brought suit for damages to his automobile arising out of a collision between the ambulance and a passenger car owned and operated by Arlie Miller. The latter filed an answer to the petition and a counterclaim for personal injuries and property damage. Politte filed a reply to the counterclaim. The parties disposed of the issues on the petition and answer. By stipulation plaintiff's petition was dismissed, the parties agreeing that the counterclaim not be affected thereby. The trial of the issues on the counterclaim and reply resulted in a jury verdict for Miller for $5,000. Politte appealed from the judgment entered on the verdict.

The collision occurred in the intersection of Bailey Road and Highway #61 in Jefferson County. Bailey Road runs east and west. Highway #61 runs north and south. Both are about 40 feet wide. The ambulance was southbound on #61. Miller drove his 1951 Dodge passenger car east on Bailey Road, intending to make a left turn to the north at the intersection. There are three lanes on Bailey Road west of the intersection: one for eastbound and one for westbound traffic, and a center lane for traffic making a left turn to the north on #61. Traffic is controlled at the intersection by electric signals. The order of color is green, amber for caution, red, green arrow for left turn, green, etc. When the lights are green for north and south traffic they are red for east and west traffic; when amber for traffic on #61 they remain red for traffic on Bailey Road. The green arrow left turn signal for eastbound traffic on Bailey Road does not come on until the signal for southbound traffic on #61 is red. The ambulance was privately owned. It was equipped with a siren and the following lights: two oscillating red lights on either fender, two blinking red lights on the top front end, two stationary red lights beside each door on the side. The ambulance was on an emergency call at the time of the collision, which occurred a few minutes after 12 o'clock on

the morning of January 1, 1954. The road was dry and the weather was clear.

Stated in the light most favorable to the prevailing party, Miller, these are the facts: Miller, driving his Dodge car eastbound, was in the center lane approaching the intersection, intending to turn left and go north on #61. The traffic light was red. He stopped his car about one car length west of the west edge of #61. There was no car in front of him. Miller's view of the highway to the north was obstructed by the dirt bank of a church lot on the northwest corner of the intersection. He could see the pavement itself for 10 feet north of the intersection and could have seen the top of an ambulance on # 61 for 100–150 feet north of the intersection, but no farther. When the green arrow for a left turn flashed on Miller proceeded into the intersection. Before doing so he did not hear anything, although his hearing is good. His windows were rolled up at the time. His eyesight is good and he is not color blind. He looked at the signals, "got the general picture and everything was clear." With respect to looking, Miller testified as follows:

"Q. Did you see any North and South bound traffic on Highway 61? A. No, sir.

"Q. Did you look? A. I watched the light there.

"Q. Did you look on Highway 61? A. No.

"Q. The question is: Did you look for North and South bound traffic on Highway 61 before you started out there? A. When I look at you I can see something moving from both sides.

"Q. Did you look to the North? A. No, not particularly.

"Q. Did you look to the South? A. No.

"Q. You just pulled out into that intersection without looking either direction to see if any traffic was coming?

A. I just saw the general picture and pulled out.

"Q. You didn't look to the North to see if there was any traffic coming from the North? A. No."

One Perret, operating the car immediately behind Miller's Dodge, first saw the ambulance when it was 100 feet north of the center of Bailey Road. He testified as follows: "Q. At any time prior to the collision did you observe any lights or signals on the ambulance? A. No, I did not." When the Dodge had proceeded across the two southbound lanes, i. e. about 20 feet into the intersection proper, having "just started out" and while traveling "not over" 20–25 miles per hour, Miller heard a siren, looked to the left and saw a red light on the top of an approaching ambulance, which was then about 50 feet to his left, traveling south in the middle of #61. When the siren "opened up" he saw the red light on the top of the ambulance. He had not seen the red light or heard the siren before that time. The driver of the ambulance had not sounded the siren before that time for the reason that there had been a green light in favor of southbound traffic and he did not think it necessary. The ambulance driver had misjudged the light. The ambulance was farther from the intersection than he judged. He did not turn on the siren until he saw the Dodge in the path of the ambulance. Miller tried to get out of the way. The Dodge traveled 8 feet from the time Miller heard the siren until the impact occurred. The front of the ambulance struck the left side of the Dodge square in the middle. The speed of the ambulance was from 40 to 50 miles per hour. It entered the intersection at from 40 to 45 miles per hour. It left skid marks 50 feet long. There was no evidence of the distance within which either vehicle could have been stopped at any given speed, or of the speed of the Dodge at any given point except as we have recited.

Defense witnesses testified that from a point one car length from the highway a

person can see north on the highway for a distance of from 300 to 400 feet; that the lights with which the ambulance was equipped could be seen on a clear dry night the distance of a half mile or more, and that the siren could be heard for a mile; that the lights and the siren were both operating continuously for several minutes before the collision, and that the Dodge shot out into the intersection suddenly when the ambulance was only three car lengths back from the intersection; that the green traffic light for southbound traffic turned amber when the ambulance was about even with the traffic light standards a few feet north of the north side of Bailey Road and was still amber when the ambulance entered the intersection.

Appellant Politte's first point is that respondent Miller was guilty of contributory negligence as a matter of law (1) in failing to look to the north before entering the intersection and (2) in failing to yield the right of way upon the immediate approach of an emergency vehicle, as required by V.A.M.S. § 304.022 which provides, subsection 1, as follows:

"Upon the immediate approach of an emergency vehicle giving audible signal by siren or while having at least one lighted lamp exhibiting red light visible under normal atmospheric conditions from a distance of five hundred feet to the front of such vehicle, the driver of every other vehicle shall yield the right of way and shall immediately drive to a position parallel to, and as far as possible to the right of the traveled portion of the highway and thereupon stop and remain in such position until such emergency vehicle has passed, except when otherwise directed by a police or traffic officer."

The duty of a motorist to exercise the highest degree of care and to maintain a careful and vigilant lookout ahead and laterally ahead when entering an intersection, Lilly v. Boswell, 362 Mo. 444, 242 S.W.2d 73; Weis v. Melvin, Mo.Sup., 219 S.W.2d 310, is not relieved or excused by the fact that he is favored by a green light nor does that fact confer upon him an absolute right to proceed across the intersection regardless of the movement of other traffic, Collier v. St. Louis Public Service Co., Mo.App., 298 S.W.2d 455. While the duty of care is commensurate with the circumstances (one of which is the green light in his favor) he cannot rely solely on the "go" signal or drive blindly into the intersection without looking. Collier v. St. Louis Public Service Co., supra; 60 C.J.S. Motor Vehicles § 360 b, p. 855. A motorist favored with a green traffic signal has the right to assume that *non-emergency* vehicles approaching on an intersecting street will obey the red light and stop, and to rely upon that assumption until he knows or by the exercise of the highest degree of care should know the contrary. Collier v. St. Louis Public Service Co., supra. As to *emergency* vehicles approaching on an intersecting street, however, he is not entitled to make that assumption. By subsection 1 of the emergency vehicle statute, V.A.M.S. § 304.022, it is his duty to yield the right of way to an emergency vehicle immediately approaching if it is *either* giving audible signal by siren *or* displaying the prescribed red light. Russell v. Nadeau, 1943, 139 Me. 286, 29 A.2d 916; Travis v. Collett, 218 Minn. 592, 17 N.W.2d 68. Neither § 304.010 RSMo 1949, V.A.M.S., requiring operators of motor vehicles to exercise the highest degree of care, nor V.A.M.S. § 304.022, subsection 1, requiring operators of motor vehicles to yield the right of way to emergency vehicles, makes any exception in the case of a motorist who has the right of way at an intersection controlled by electric signals. In compliance with the last cited statutes every operator of a private motor vehicle must anticipate the possibility of emergency vehicles commandeering street intersections and, in the exercise of the highest degree of care, must be on the lookout or on the alert for them notwithstanding the ordinary traffic flow at a particular intersection is regulated by

electric signals and the green light is in the operator's favor.

■■ It is conceded that Miller did not yield the right of way under the emergency statute, V.A.M.S. § 304.022, subsection 1, but we cannot hold him guilty of contributory negligence as a matter of law for failure to do so unless it appears from uncontradicted testimony or by necessary inference therefrom that he had actual or constructive notice of the immediate approach of an emergency vehicle on an emergency call and a reasonable opportunity to bring his vehicle to the position required by the section, and stop. Russell v. Nadeau, supra; Balthasar v. Pacific Electric Ry. Co., 187 Cal. 302, 202 P. 37, 19 A.L.R. 452; 5 Am.Jur. 666; 60 C.J.S. Motor Vehicles § 371, p. 924. It is uncontradicted that the ambulance was an emergency vehicle on an emergency call. While there was substantial evidence that at all pertinent times the statutory red light was displayed and an audible signal by siren was sounded by the ambulance, there was sufficient evidence to the contrary to take the matter out of the hands of the court and require that the question be resolved by the jury. Travis v. Collett, supra. Under Miller's testimony he did not have *actual* knowledge of the approach of the ambulance until the latter was only 50 feet north of his automobile. He cannot be charged with *constructive* knowledge of the approach of the ambulance on the basis that the siren was sounding, because there was evidence that the ambulance driver did not "open up" the siren until the ambulance was 50 feet short of the collision, or on the basis that the red light was exhibited, because there was evidence from which the jury could conclude that the ambulance's statutory light was not exhibited until the ambulance was within 100 feet of the point of collision. Witness Perret testified that when he first saw the ambulance it was 100 feet north of the center of Bailey Road; that at no time prior to the collision did he observe any lights or signals on the ambulance and that the ambulance was lighted up by a diffused light from the beams of the headlights of the Miller and Perret automobiles. Perret stated that his attention was "primarily riveted on the green arrow" but giving Miller the benefit of every favorable inference, a jury could infer from this testimony and from the speed of the ambulance that the ambulance was not displaying the prescribed light until the last second or two before the collision. In each of these contingencies reasonable minds could differ on the question whether Miller's knowledge, actual or constructive, of the immediate approach of the ambulance came at a time too late for him to comply with subsection 1, V.A.M.S. § 304.022.

It is conceded that Miller did not look to the north to see if any traffic was coming and proceeded into the intersection upon the assumption that "everything was clear" from the "general picture" of the intersection gained by looking at the electric signals, but we cannot hold him guilty of contributory negligence as a matter of law in failing to look unless it appears from uncontradicted testimony or by necessary inference therefrom that he had the ability and means at hand, after he could or should have seen the ambulance, to avoid the collision. Politte forcefully maintains that Miller could have seen the ambulance from his stationary position while awaiting the change in the traffic lights or very shortly thereafter and in either event in ample time to have stopped; that the Miller automobile traveled 38 feet from its parked position to the point of collision; that the average speed of the Miller automobile over that distance (agreed upon by the parties) was 10 miles per hour, and that the speed of the ambulance was 40 miles per hour. From this Politte concludes that the ambulance was 152 feet north of the intersection at the time the light changed. Politte points to Miller's testimony that he could have seen the ambulance if he had looked when it was 150 feet away and that he did not look, and argues that as a matter of law Miller could and should

have stopped almost instantly. While the case is close on the facts our final conclusion is that it was a jury question. To declare unequivocally that Miller could have stopped or otherwise avoided the collision after he could or should have seen the ambulance involves speculation. The accident occurred at midnight on a dark night. The illumination around the intersection was "not too great." Miller testified that on account of the dirt bank to his left he could see only the top (but not the whole) of the ambulance when it was 100–150 feet north and Miller was parked 18 feet west of the intersection. From that position Miller said he could see the concrete surface of the highway only to the extent of 10 feet north of the intersection. At the intersection proper one could see 400 feet to the north but Miller did not testify as to visibility to the north at any point between those two positions. All reasonable minds would not agree that Miller could and should have seen the ambulance and that it was lighted for an emergency run at the time the ambulance was 150 feet north of the intersection. From Perret's and Miller's testimony the jury could have found that the red lights and the blinkers at the top of the automobile were not lighted until the ambulance was less than 100 feet from the point of collision. There was no evidence as to the position or speed of Miller's automobile at that time. We cannot take judicial notice that when Miller's automobile had covered one-half the distance it traveled it was operating at one-half the maximum speed it eventually attained. There was no evidence as to rate of acceleration of Miller's automobile. There was no evidence of the distance within which the Miller automobile could be stopped at any particular speed. The Miller automobile traveled 46 feet (not 38 feet) from its stationary position to the point of collision. It was but a short distance (approximately 31–37 feet) from the front of the parked Miller automobile to the path of the ambulance. There was little evidence of the speed of Miller's automobile at any particular time except

that it was going "slow" or "not over" 20–25 miles per hour at it proceeded across the intersection. It is difficult enough to fix liability by mathematical calculation when speeds and distances are definitely given. It is impossible to do so in the absence of definite evidence. All reasonable minds would not agree that Miller had the ability and means at hand, after he could or should have seen the ambulance, to avoid the collision.

Appellant Politte urges that the court erred in giving Instruction No. 1 which follows:

"The Court instructs the jury that under the law of this State an ambulance responding to an emergency call may proceed past a red or stop signal, but only after slowing down as may be reasonably necessary for safe operation and while sounding an audible signal as may be reasonably necessary.

"In that regard you are instructed that if you find from the evidence that on the occasion mentioned in evidence Arlie Miller from a stopped position at the intersection with Highway 61–67 made a left turn into the highway at a time when the electric signal for eastbound traffic on Bailey Road indicated a green arrow in his favor; and

"If you further find from the evidence that the ambulance driver either failed to slow down to a speed reasonably necessary for safe operation under the circumstances then and there existing or failed to sound an audible signal reasonably necessary under those circumstances and that in so failing, if you find he did so fail, to either slow down or give a signal the ambulance driver was negligent and that such negligence, if any, directly caused injury to Arlie Miller and that at all times Arlie Miller was not guilty of negligence at any time mentioned in evidence;

"Then and in that event you are instructed that Arlie Miller is entitled to recover and your verdict should be in his favor."

Instruction No. 1 is based upon paragraph (2) (b) of subsection 4 of V.A.M.S. § 304.022 which, taken in connection with paragraph (3) of subsection 4, allows the driver of an emergency vehicle to proceed past a red or stop signal "only after slowing down as may be necessary for safe operation" and only when the driver of such vehicle "sounds audible signal by bell, siren, or exhaust whistle as may be reasonably necessary, and when the vehicle is equipped with" the prescribed red light.

Politte claims that Instruction No. 1 fails to hypothesize any facts or give the jury any guide or standard by which the ambulance driver's conduct should be judged, and permits the jury to determine whether he failed to slow down to a speed reasonably necessary for safe operation according to its own judgment as to the law and without requiring a finding of previous excessive speed.

■ Facts which are essential to support a finding of negligence should be hypothesized in a verdict-directing instruction, where there is a conflict in the evidence relating thereto. Knight v. Richey, 363 Mo. 293, 250 S.W.2d 972. The statutory duty of the driver of an emergency vehicle under V.A.M.S. § 304.022, paragraph (2) (b), to slow down to a speed reasonably necessary for safe operation arises when he undertakes to proceed past a red stop light. Miller's whole case was based upon the theory that the ambulance went through a red stop light. From the testimony of Miller and his witnesses Miller proceeded into the intersection on a green arrow, from which it follows that the traffic light confronting the ambulance was red. However, the evidence was not all one way on this essential fact. The witnesses contradicted each other on the question whether the ambulance passed a red stop light when it entered the intersection. Politte's witnesses testified that the ambulance proceeded into the intersection on an amber light. The ambulance driver testified that as he approached the intersection the light for southbound traffic was green; that a few feet before he got to the intersection it turned amber and *never did turn red* and that according to the lights he had a right to proceed. The fact that the ambulance passed a red stop light as it entered the intersection was a fact essential to support a finding of negligence. Instruction No. 1 erroneously omitted the requirement that the jury find that fact. A general submission in such a situation is reversible error. Levin v. Caldwell, Mo.Sup., 285 S.W.2d 655, loc. cit. 660 in which it was said:

"We have concluded that the instruction under consideration should have required a specific finding of the essential fact which we have held would have supported a finding of the ultimate fact or issue of excessive speed. There was a direct conflict in the evidence on the question as to which driver had the green light. It would therefore appear that, in fairly submitting the issue of Kotelov's negligence in driving at an excessive rate of speed, there should have been a submission of the fact that a red signal was displayed when he approached and moved out into the intersection. We conclude that the general submission was reversible error."

■ Instruction No. 1, which in part is based upon failure to slow down to a speed reasonably necessary for safe operation, erroneously omitted the requirement that the jury find that the ambulance was operating at an unsafe speed. The instruction improperly assumes that the ambulance driver was proceeding at a speed in excess of that reasonably necessary for safe operation under the circumstances then and there existing. While there was no essential divergence in the testimony as to the speed of the ambulance (all the

witnesses fixed it at from 35 to 50 miles per hour) there was no agreement that that speed was excessive. Whether that speed was in excess of the speed reasonably necessary for safe operation was the very crux of the case. Instruction No. 1 failed to require that fact to be found, or any facts from which the jury could determine whether Politte's driver failed to slow down to a speed reasonably necessary for safe operation under the circumstances. The reduction of speed by the ambulance driver necessary for the ambulance to safely pass through the intersection would depend on the relative speeds and positions of the two vehicles, the distances separating them at the time each of them entered the intersection, the opportunity and ability of Miller to stop, etc.

Likewise the reasonable necessities of the situation with respect to the sounding of the audible signal required by the statute would depend upon various facts, none of which was submitted in Instruction No. 1. The sounding of an audible signal "as may be reasonably necessary" among other things means loud enough to be heard and soon enough to be acted upon. The timeliness of the sounding of the siren, the position and speed of Miller's automobile and Miller's ability, upon hearing the signal, to control the movements of his automobile so as to avoid a collision, are facts which should have been but were not included in the submission.

Finally, Instruction No. 1 was confusing and misleading. The only fact actually hypothesized (that from a stopped position at the intersection Miller made a left turn into the highway on a green arrow) was inaccurate. He did not turn directly left into the highway. Under conceded facts Miller had to travel straight forward 18 feet to the west edge and 20 additional feet to the center line of the highway before he would be in a position to execute his intention to turn to the left.

The giving of Instruction No. 1 constituted reversible error.

On a new trial the propriety of Instruction No. 2 on the measure of damages and the unnumbered instruction found at pages 122–123 of the transcript can be reconsidered and any errors corrected.

For error in the giving of Instruction No. 1 the judgment should be reversed and the cause remanded for a new trial, and the Commissioner so recommends.

PER CURIAM.

The foregoing opinion of HOUSER, C., is adopted as the opinion of the court.

The judgment of the circuit court is, accordingly, reversed and the cause remanded for a new trial.

RUDDY, P. J., ANDERSON, J., and WM. H. KILLOREN, Special Judge, concurs.